ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 19A1070

_____

## CALVARY CHAPEL DAYTON VALLEY *v.* STEVE SISOLAK, GOVERNOR OF NEVADA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[July 24, 2020]

The application for injunctive relief presented to JUSTICE KAGAN and by her referred to the Court is denied.

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE KAVANAUGH join, dissenting from denial of application for injunctive relief.

The Constitution guarantees the free exercise of religion. It says nothing about the freedom to play craps or black-jack, to feed tokens into a slot machine, or to engage in any other game of chance. But the Governor of Nevada apparently has different priorities. Claiming virtually unbounded power to restrict constitutional rights during the COVID–19 pandemic, he has issued a directive that severely limits attendance at religious services. A church, synagogue, or mosque, regardless of its size, may not admit more than 50 persons, but casinos and certain other favored facilities may admit 50% of their maximum occupancy— and in the case of gigantic Las Vegas casinos, this means that thousands of patrons are allowed.

That Nevada would discriminate in favor of the powerful gaming industry and its employees may not come as a surprise, but this Court's willingness to allow such discrimination is disappointing. We have a duty to defend the Constitution, and even a public health emergency does not absolve us of that responsibility.

I

Calvary Chapel Dayton Valley is a church located in rural Nevada. It wishes to host worship services for about 90 congregants, a figure that amounts to 50% of its fire-code capacity. In conducting these services, Calvary Chapel plans to take many precautions that go beyond anything that the State requires. In addition to asking congregants to adhere to proper social distancing protocols, it intends to cut the length of services in half. It also plans to require six feet of separation between families seated in the pews, to prohibit items from being passed among the congregation, to guide congregants to designated doorways along one-way paths, and to leave sufficient time between services so that the church can be sanitized. According to an infectious disease expert, these measures are "equal to or more extensive than those recommended by the CDC." Electronic Court Filing in No. 3:20–CV–00303, Doc. 38–31 (D Nev., June 4, 2020), p. 6 (ECF).

Yet hosting even this type of service would violate Directive 21, Nevada Governor Steve Sisolak's phase-two reopening plan, which limits indoor worship services to "no more than fifty persons." ECF Doc. 38–2, §11. Meanwhile, the directive caps a variety of secular gatherings at 50% of their operating capacity, meaning that they are welcome to exceed, and in some cases far exceed, the 50-person limit imposed on places of worship.

Citing this disparate treatment, Calvary Chapel brought suit in Federal District Court and sought an injunction allowing it to conduct services, in accordance with its plan, for up to 50% of maximum occupancy. The District Court refused to grant relief, the Ninth Circuit denied Calvary Chapel's application for an injunction pending appeal, and now this Court likewise denies relief.

I would grant an injunction pending appeal. Calvary Chapel is very likely to succeed on its claim that the di-

rective's discriminatory treatment of houses of worship violates the First Amendment. In addition, unconstitutionally preventing attendance at worship services inflicts irreparable harm on Calvary Chapel and its congregants, and the State has made no effort to show that conducting services in accordance with Calvary Chapel's plan would pose any greater risk to public health than many other activities that the directive allows, such as going to the gym. The State certainly has not shown that church attendance under Calvary Chapel's plan is riskier than what goes on in casinos.

For months now, States and their subdivisions have responded to the pandemic by imposing unprecedented restrictions on personal liberty, including the free exercise of religion. This initial response was understandable. In times of crisis, public officials must respond quickly and decisively to evolving and uncertain situations. At the dawn of an emergency—and the opening days of the COVID–19 outbreak plainly qualify—public officials may not be able to craft precisely tailored rules. Time, information, and expertise may be in short supply, and those responsible for enforcement may lack the resources needed to administer rules that draw fine distinctions. Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules. In general, that is what has happened thus far during the COVID–19 pandemic.

But a public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights. Governor Sisolak issued the directive in question on May 28, more than two months after declaring a state of emergency on March 12. Now four months have passed since the original declaration. The problem is no longer one of exigency, but one of considered

yet discriminatory treatment of places of worship.

## II

Calvary Chapel argues that the Governor's directive violates both the Free Exercise Clause and the Free Speech Clause of the First Amendment, and I agree that Calvary Chapel has a very high likelihood of success on these claims.

## A

Under the Free Exercise Clause, restrictions on religious exercise that are not "neutral and of general applicability" must survive strict scrutiny. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 531 (1993). "[T]he minimum requirement of neutrality is that a law not discriminate on its face," *id.*, at 533, and "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. ___, ___ (2018) (slip op., at 17) (quoting *Church of Lukumi*, 508 U. S., at 534). Here, the departure is hardly subtle. The Governor's directive specifically treats worship services differently from other activities that involve extended, indoor gatherings of large groups of people.

The face of the directive provides many examples. While "houses of worship" may admit "no more than fifty persons," ECF Doc. 38–2, §11, many favored facilities that host indoor activities may operate at 50% capacity. Privileged facilities include bowling alleys, §20, breweries, §26, fitness facilities, §28, and most notably, casinos, which have operated at 50% capacity for over a month, §35; ECF Doc. 38–3, p. 5, sometimes featuring not only gambling but live circus acts and shows.

For Las Vegas casinos, 50% capacity often means thousands of patrons, and the activities that occur in casinos frequently involve far less physical distancing and other

safety measures than the worship services that Calvary Chapel proposes to conduct. Patrons at a craps or blackjack table do not customarily stay six feet apart. Casinos are permitted to serve alcohol, which is well known to induce risk taking, and drinking generally requires at least the temporary removal of masks. Casinos attract patrons from all over the country. In anticipation of reopening, one casino owner gave away 2,000 one-way airline tickets to Las Vegas. ECF Doc. 38–9, p. 4. And when the Governor announced that casinos would be permitted to reopen, he invited visitors to come to the State.[1] The average visitor to Las Vegas visits more than six different casinos, potentially gathering with far more than 50 persons in each one. ECF Doc. 38–6, p. 44. Visitors to Las Vegas who gamble do so for more than two hours per day on average, *id.*, at 43, and gamblers in a casino often move from one spot to another, trying their luck at different games or at least at different slot machines.

Houses of worship can—and have—adopted rules that provide far more protection. Family groups can be given places in the pews that are more than six feet away from others. Worshippers can be required to wear masks throughout the service or for all but a very brief time. Worshippers do not customarily travel from distant spots to attend a particular church; nor do they generally hop from church to church to sample different services on any given Sunday. Few worship services last two hours. (Calvary Chapel now limits its services to 45 minutes.) And worshippers do not generally mill around the church while a service is in progress.

The idea that allowing Calvary Chapel to admit 90 worshippers presents a greater public health risk than allowing

_____

[1] See Jones, Nevada Governor Green-Lights June 4 Reopening of Casinos; Las Vegas Gets Ready, L. A. Times (May 26, 2020), www.latimes.com/travel/story/2020-05-26/nevada-governor-oks-reopening-vegas-prepares.

casinos to operate at 50% capacity is hard to swallow, and the State's efforts to justify the discrimination are feeble. It notes that patrons at gaming tables are supposed to wear masks and that the service of food at casinos is now limited, but congregants in houses of worship are also required to wear masks, and they do not consume meals during services.

The State notes that facilities other than houses of worship, such as museums, art galleries, zoos, aquariums, trade schools, and technical schools, are also treated less favorably than casinos, but obviously that does not justify preferential treatment for casinos.

Finally, the State argues that preferential treatment for casinos is justified because the State is in a better position to enforce compliance by casinos, which are under close supervision by state officials and subject to penalties if they violate state rules. By contrast, the State notes, rules for houses of worship must be enforced by local authorities.

This argument might make some sense if enforcing the 50% capacity rule were materially harder than enforcing a flat 50-person rule. But there is no reason to think that is so, let alone that it would be compelling enough to justify differential treatment of religion. Local officials responsible for enforcing maximum occupancy limits during normal times presumably know or can easily ascertain the limit for particular churches, and the State does not claim that these officials have any trouble enforcing those limits. In many jurisdictions, buildings that host gatherings are required to post their maximum occupancy figure in a prominent location. Enforcing a 50% limit would not require local officials to do anything more than divide that figure in half, and there is no reason to think that enforcing that limit would be any harder than enforcing a 50-person maximum.

Moreover, even if the State's special regulatory power over casinos could justify different rules for those facilities, the State would still have no explanation why facilities like

bowling alleys, arcades, and fitness centers are also given the benefit of the 50% rule. And while the State suggests that it strictly enforces the rules applicable to casinos, photos and videos taken in casinos after they were allowed to reopen show widespread and blatant safety violations. Patrons without masks are seen at close quarters, and the State has not brought to our attention any evidence that it has cracked down on non-complying casinos. The sharp spike in COVID–19 cases since the casinos reopened belies the State's strict enforcement claims.

While the directive's treatment of casinos stands out, other facilities are also given more favorable treatment than houses of worship. Take the example of bowling alleys. Some Las Vegas bowling alleys where tournaments are held can seat hundreds of spectators, and under the directive, these facilities may admit up to 50% of capacity. Not only that, the State tolerates seating arrangements at these facilities that pose far more danger than the plan Calvary Chapel proposes. An official state guidance document states that groups of up to 50 people may sit together in the grandstands of a bowling alley provided that they maintain social distancing from other groups. ECF Doc. 38–5, p. 9. Thus, while Calvary Chapel cannot admit more than 50 congregants even if families sit six feet apart, spectators at a bowling tournament can *sit together in groups of 50* provided that each group maintains social distancing *from other groups*.

In sum, the directive blatantly discriminates against houses of worship and thus warrants strict scrutiny under the Free Exercise Clause.

## B

The directive fares no better under the Free Speech Clause. Laws that restrict speech based on the viewpoint it expresses are presumptively unconstitutional, see, *e.g.*, *Iancu* v. *Brunetti*, 588 U. S. ___, ___–___ (2019) (slip op., at

4–5), and under our cases religion counts as a viewpoint, *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 831 (1995). Here, the Directive plainly discriminates on the basis of viewpoint. Compare the directive's treatment of casino entertainment and church services. Both involve expression, but the directive favors the secular expression in casino shows over the religious expression in houses of worship.

Calvary Chapel has also brought to our attention evidence that the Governor has favored certain speakers over others. When large numbers of protesters openly violated provisions of the Directive, such as the rule against groups of more than 50 people, the Governor not only declined to enforce the directive but publicly supported and participated in a protest. Cf. *Masterpiece Cakeshop*, 584 U. S., at ___–___ (slip op., at 14–16). He even shared a video of protesters standing shoulder to shoulder. The State's response to news that churches might violate the directive was quite different. The attorney general of Nevada is reported to have said, "'You can't spit . . . in the face of law and not expect law to respond.'"[2]

Public protests, of course, are themselves protected by the First Amendment, and any efforts to restrict them would be subject to judicial review. But respecting some First Amendment rights is not a shield for violating others. The State defends the Governor on the ground that the protests expressed a viewpoint on important issues, and that is undoubtedly true, but favoring one viewpoint over others is anathema to the First Amendment.

_____

[2] Application 8, and n. 6 (quoting Lochhead, Sisolak, Elected Nevada Officials Discuss Systemic Racism, Reform, Las Vegas Review-Journal (June 5, 2020), www.reviewjournal.com/news/politics-and-government/ nevada/sisolak-elected-nevada-officials-discuss-systemic-racism-reform-2045833/).

C

Once it is recognized that the directive's treatment of houses of worship must satisfy strict scrutiny, it is apparent that this discriminatory treatment cannot survive. Indeed, Nevada does not even try to argue that the directive can withstand strict scrutiny.

Having allowed thousands to gather in casinos, the State cannot claim to have a compelling interest in limiting religious gatherings to 50 people—regardless of the size of the facility and the measures adopted to prevent the spread of the virus. "[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi*, 508 U. S., at 547 (internal quotation marks omitted). And even if the 50-person limit served a compelling interest, the State has not shown that public safety could not be protected at least as well by measures such as those Calvary Chapel proposes to implement.

D

The State's primary defense of the directive's treatment of houses of worship is based on two decisions of this Court. Quoting certain language in *Jacobson* v. *Massachusetts*, 197 U. S. 11 (1905), Nevada argues that "when a state exercises emergency police powers to enact an emergency public health measure, courts will uphold it unless (1) there is no real or substantial relation to public health, or (2) the measures are 'beyond all question' a 'plain[,] palpable [invasion] of rights secured by the fundamental law.'" Response to Application 11 (quoting *Jacobson*, 197 U. S., at 31).

Even under this test, the directive's discriminatory treatment would likely fail for the reasons already explained. And in any event, it is a mistake to take language in *Jacobson* as the last word on what the Constitution allows public officials to do during the COVID–19 pandemic. Language

in *Jacobson* must be read in context, and it is important to keep in mind that *Jacobson* primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated for small pox.[3]  It is a considerable stretch to read the decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case.

The State also points to the Court's recent refusal to issue a temporary injunction against enforcement of a California law that limited the number of persons allowed to attend church services.  See *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___ (2020).  I dissented from that decision, see *ibid.*; see also *id.*, at ___ (KAVANAUGH, J., dissenting), but even if it is accepted, that case is different from the one now before us.  In *South Bay*, a church relied on the fact that the California law treated churches less favorably than certain other facilities, such as factories, offices, supermarkets, restaurants, and retail stores.  But the law was defended on the ground that in these facilities, unlike in houses of worship, "people neither congregate in large groups nor remain in close proximity for extended periods."  *Id.*, at ___ (ROBERTS, C. J., concurring) (slip op., at 2).  That cannot be said about the facilities favored in Nevada.  In casinos and other facilities granted preferential treatment under the directive, people congregate in large groups and remain in close proximity for extended periods.

_____

[3] The Court brushed aside Jacobson's claims that the challenged law violated the Preamble and the spirit of the Constitution.  *Jacobson*, 197 U. S., at 22.  His claim under the Privileges or Immunities Clause of the Fourteenth Amendment was doomed by the *Slaughter-House Cases*, 16 Wall. 36, 76–80 (1873), and was not addressed by the Court.  Finally, the Court quickly rejected his equal protection claim, *Jacobson*, 197 U. S., at 30, which was based on the law's exemption for children and persons under guardianship, see *Commonwealth* v. *Jacobson*, decided with *Commonwealth* v. *Pear*, 183 Mass. 242, 248, 66 N. E. 719, 722 (1903).

## E

An injunction pending appeal is warranted in this case. Calvary Chapel's First Amendment claims are very likely to succeed. Indeed, it can be said that its "legal rights . . . are indisputably clear," *Turner Broadcasting System, Inc.* v. *FCC*, 507 U. S. 1301, 1303 (1993) (Rehnquist, C. J., in chambers) (internal quotation marks omitted), and the equities also favor Calvary Chapel. Preventing congregants from worshipping will cause irreparable harm, and the State has made no effort to show that Calvary Chapel's plans would create a serious public health risk.

\*          \*          \*

I would issue an injunction barring the State, pending appeal, from interfering with worship services conducted at Calvary Chapel in accordance with its stated plan and the general facemask requirement. I therefore respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 19A1070

CALVARY CHAPEL DAYTON VALLEY *v.* STEVE
SISOLAK, GOVERNOR OF NEVADA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[July 24, 2020]

JUSTICE GORSUCH, dissenting from denial of application
for injunctive relief.

This is a simple case. Under the Governor's edict, a 10-screen "multiplex" may host 500 moviegoers at any time. A casino, too, may cater to hundreds at once, with perhaps six people huddled at each craps table here and a similar number gathered around every roulette wheel there. Large numbers and close quarters are fine in such places. But churches, synagogues, and mosques are banned from admitting more than 50 worshippers—no matter how large the building, how distant the individuals, how many wear face masks, no matter the precautions at all. In Nevada, it seems, it is better to be in entertainment than religion. Maybe that is nothing new. But the First Amendment prohibits such obvious discrimination against the exercise of religion. The world we inhabit today, with a pandemic upon us, poses unusual challenges. But there is no world in which the Constitution permits Nevada to favor Caesars Palace over Calvary Chapel.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19A1070

_____

## CALVARY CHAPEL DAYTON VALLEY *v.* STEVE SISOLAK, GOVERNOR OF NEVADA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[July 24, 2020]

JUSTICE KAVANAUGH, dissenting from denial of application for injunctive relief.

I join JUSTICE ALITO's dissent in full and respectfully add these further comments.

Under its current reopening plan, Nevada allows restaurants, bars, casinos, and gyms to grant entrance to up to 50% of their total occupancy limit—no matter how many people that may be. For example, a casino with a 500-person occupancy limit may let in up to 250 people. By contrast, places of worship may only take in a maximum of 50 people, without exception, regardless of the occupancy cap. So unlike a casino next door, a church with a 500-person occupancy limit may let in only 50 people, not 250 people. Nevada has offered no persuasive justification for that overt discrimination against places of worship. The risk of COVID–19 transmission is at least as high at restaurants, bars, casinos, and gyms as it is at religious services. Indeed, people congregating in restaurants, bars, casinos, and gyms often linger at least as long as they do at religious services. And given the safety measures that Calvary Chapel and other places of worship are following—including social distancing, mask wearing, and certain additional voluntary measures—it is evident that people interact with others at restaurants, bars, casinos, and gyms at least as closely as they do at religious services.

In my view, Nevada's discrimination against religious

services violates the Constitution. To be clear, a State's closing or reopening plan may subject religious organizations to the *same* limits as secular organizations. And in light of the devastating COVID–19 pandemic, those limits may be very strict. But a State may not impose strict limits on places of worship and looser limits on restaurants, bars, casinos, and gyms, at least without sufficient justification for the differential treatment of religion. As I will explain, Nevada has thus far failed to provide a sufficient justification, and its current reopening plan therefore violates the First Amendment.

In Part I, I will explain how this case fits into the Court's broader religion jurisprudence. In Part II, I will explain why Nevada's treatment of religious organizations is unconstitutional under the Court's precedents.

## I

Religion cases are among the most sensitive and challenging in American law. Difficulties can arise at the outset because the litigants in religion cases often disagree about how to characterize a law. They may disagree about whether a law favors religion or discriminates against religion. They may disagree about whether a law treats religion equally or treats religion differently. They may disagree about what it means for a law to be neutral toward religion.

The definitional battles over what constitutes favoritism, discrimination, equality, or neutrality can influence, if not decide, the outcomes of religion cases. But the parties to religion cases and the judges deciding those cases often do not share a common vocabulary or common background principles. And that disconnect can muddy the analysis, build resentment, and lead to litigants and judges talking past one another.

In my view, some of the confusion and disagreement can

be averted by first identifying and distinguishing four categories of laws: (1) laws that expressly discriminate against religious organizations; (2) laws that expressly favor religious organizations; (3) laws that do not classify on the basis of religion but apply to secular and religious organizations alike; and (4) laws that expressly treat religious organizations equally to some secular organizations but better or worse than other secular organizations.  As I will explain, this case involving Nevada's reopening plan falls into the fourth category.

*First* are laws that expressly discriminate against religious organizations because of religion.  The recent *Espinoza* case fell into that category.  *Espinoza* v. *Montana Dept. of Revenue, ante,* p. ___.  The State of Montana provided tax credits to those who contributed to private school scholarship organizations.  But there was a significant catch: Families eligible for scholarship funds could use those funds only at secular private schools, not religious private schools.  Cases like that are straightforward examples of religious discrimination.  And as a general rule, laws that discriminate against religion are, in the Court's words, "odious to our Constitution." *Espinoza, ante,* at 22 (internal quotation marks omitted); see *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___ (2017); *Good News Club* v. *Milford Central School*, 533 U. S. 98 (2001); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Larson* v. *Valente*, 456 U. S. 228 (1982); *McDaniel* v. *Paty*, 435 U. S. 618, 629 (1978) (Brennan, J., concurring in judgment); see also *Murphy* v. *Collier*, 587 U. S. ___ (2019) (KAVANAUGH, J., concurring in grant of application for stay); cf. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520 (1993).

*Second* are laws that expressly favor religious organizations over secular organizations.  Examples include cases where a legislature affords religious organizations certain

accommodations, exemptions, or benefits that are not available to secular organizations.  The legislature might, for example, grant religious organizations a property tax exemption that is not available to secular organizations.  Cf. *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664 (1970).  Or the legislature might authorize accommodations for certain religious individuals (but not secular individuals) that relieve them from the burdens of otherwise-applicable laws, such as the draft.  See *Gillette* v. *United States*, 401 U. S. 437 (1971).  Those kinds of accommodations or exemptions can sometimes trigger Establishment Clause challenges because of the apparent favoritism of religion.  See generally *American Legion* v. *American Humanist Assn.*, 588 U. S. ___, ___ (2019) (KAVANAUGH, J., concurring); see also *Cutter* v. *Wilkinson*, 544 U. S. 709 (2005); *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687, 722 (1994) (Kennedy, J., concurring in judgment); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327 (1987).

*Third* are laws that apply to religious and secular organizations alike without making any classification on the basis of religion.  For example, a city fire code may require sprinklers in all buildings that can hold more than 100 people.  A law like that would cover buildings owned by religious organizations and buildings owned by secular organizations.  Those kinds of laws on their face present no impermissible discrimination or favoritism.

To be sure, those kinds of laws, although not differentiating between religious and secular organizations, can still sometimes impose substantial burdens on religious exercise.  If so, a religious organization may seek an exemption in court (if not also in the legislature) to the extent available under federal or state law and permissible under the Establishment Clause.  See, *e.g., Our Lady of Guadalupe School* v. *Morrissey-Berru, ante,* p. ___; *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418 (2006).

Or a religious organization may contend that the facially neutral law was actually motivated by animus against religion and is unconstitutional on that ground. See *Lukumi*, 508 U. S. 520.

*Fourth* are laws—like Nevada's in this case—that supply no criteria for government benefits or action, but rather divvy up organizations into a favored or exempt category and a disfavored or non-exempt category. Those laws provide benefits only to organizations in the favored or exempt category and not to organizations in the disfavored or non-exempt category.

For example, consider a zoning law that places some secular organizations (apartment buildings, small retail businesses, restaurants, banks, etc.) in a favored or exempt zoning category, and places some secular organizations (office buildings, large retail businesses, movie theaters, music venues, etc.) in a disfavored or non-exempt zoning category. Suppose that religious properties arguably could be considered similar to some of the secular properties in *both* categories. What, then, are the constitutional limits and requirements with respect to how the legislature may categorize religious organizations?

In those circumstances, the Court's precedents make clear that the legislature *may* place religious organizations in the favored or exempt category rather than in the disfavored or non-exempt category without causing an Establishment Clause problem. See, *e.g., Walz*, 397 U. S., at 696 (opinion of Harlan, J.) ("[T]he critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter"); *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1, 14 (1989) (plurality opinion) (expressing approval of subsidies "conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end"); *Concerned Citizens of Carderock* v. *Hubbard*, 84

F. Supp. 2d 668 (Md. 2000) (State may place religious or-
ganizations in favored zoning category along with some sec-
ular organizations).

The converse free-exercise or equal-treatment question is
whether the legislature is *required* to place religious organ-
izations in the favored or exempt category rather than in
the disfavored or non-exempt category. The Court's free-
exercise and equal-treatment precedents also supply an an-
swer to that question: Unless the State provides a sufficient
justification otherwise, it must place religious organiza-
tions in the favored or exempt category. See Laycock, The
Remnants of Free Exercise, 1990 S. Ct. Rev. 1, 49–50 (ex-
plaining how this Court's precedents grant "something
analogous to most-favored nation status" to religious organ-
izations).

In *Employment Div., Dept. of Human Resources of Ore.* v.
*Smith*, 494 U. S. 872 (1990), for example, the Court ex-
plained that "where the State has in place a system of indi-
vidual exemptions, it may not refuse to extend that system
to cases of religious hardship *without compelling reason.*"
*Id.*, at 884 (internal quotation marks omitted; emphasis
added); see also *Lukumi*, 508 U. S., at 537–538. Likewise,
then-Judge Alito stated that the First Amendment required
a police department to exempt Sunni Muslims from its no-
beard policy because the police department made "exemp-
tions from its policy for secular reasons and has not offered
*any substantial justification* for refusing to provide similar
treatment for officers who are required to wear beards for
religious reasons." *Fraternal Order of Police Newark Lodge
No. 12* v. *Newark*, 170 F. 3d 359, 360 (CA3 1999) (emphasis
added).

Put simply, under the Court's religion precedents, when
a law on its face favors or exempts some secular organiza-
tions as opposed to religious organizations, a court enter-
taining a constitutional challenge by the religious organiza-
tions must determine whether the State has sufficiently

justified the basis for the distinction.

To be clear, the Court's precedents do *not* require that religious organizations be treated *more favorably* than all secular organizations. Rather, the First Amendment requires that religious organizations be treated *equally* to the favored or exempt secular organizations, unless the State can sufficiently justify the differentiation.

Stated otherwise, in these kinds of cases, the Court's religion precedents require a basic two-step inquiry. First, does the law create a favored or exempt class of organizations and, if so, do religious organizations fall outside of that class? That threshold question does not require judges to decide whether a church is more akin to a factory or more like a museum, for example. Rather, the only question at the start is whether a given law on its face favors certain organizations and, if so, whether religious organizations are part of that favored group. If the religious organizations are not, the second question is whether the government has provided a sufficient justification for the differential treatment and disfavoring of religion. Cf. *Smith*, 494 U. S., at 884.

In seeking to justify the differential treatment in those kinds of cases, it is not enough for the government to point out that other secular organizations or individuals are also treated *unfavorably*. The point "is not whether one or a few secular analogs are regulated. The question is whether a single secular analog is *not* regulated." Laycock & Collis, Generally Applicable Law and the Free Exercise of Religion, 95 Neb. L. Rev. 1, 22 (2016). To that end, the government must articulate a sufficient justification for treating some secular organizations or individuals *more favorably* than religious organizations or individuals. See *Smith*, 494 U. S., at 884. That point is subtle but absolutely critical. And if that point is not fully understood, then cases of this kind will be wrongly decided.

## II

I turn then to analyzing Nevada's rules under the Court's precedents. As JUSTICE ALITO explains in his dissent, Nevada has now had more than four months to respond to the initial COVID–19 crisis and adjust its line-drawing as circumstances change. Yet Nevada is still discriminating against religion. Nevada applies a strict 50-person attendance cap to religious worship services, but applies a looser 50% occupancy cap to secular organizations like restaurants, bars, casinos, and gyms.

Nevada has gestured at two possible justifications for that discrimination: public health and the economy. But neither argument is persuasive on this record.

*First* is the State's public health rationale. Nevada undoubtedly has a compelling interest in combating the spread of COVID–19 and protecting the health of its citizens. But it does not have a persuasive public health reason for treating churches differently from restaurants, bars, casinos, and gyms. Calvary Chapel is happy to abide by the same 50% occupancy cap or some stricter across-the-board standard, as the State sees fit, so long as the same standard applies to those secular businesses. And the Church has committed to social distancing, mask requirements, and certain voluntary safety measures.

The State has not explained why a 50% occupancy cap is good enough for secular businesses where people congregate in large groups or remain in close proximity for extended periods—such as at restaurants, bars, casinos, and gyms—but is not good enough for places of worship. Again, it does not suffice to point out that *some* secular businesses, such as movie theaters, are subject to the lesser of a 50-person or 50% occupancy cap. The legal question is not whether religious worship services are all alone in a disfavored category, but why they are in the disfavored category to begin with. See *Smith*, 494 U. S., at 884. And Nevada has not advanced a sufficient public health rationale for

that decision. To reiterate, the State has substantial room to draw lines, especially in an emergency or crisis. But Nevada has not demonstrated that public health justifies taking a looser approach with restaurants, bars, casinos, and gyms and a stricter approach with places of worship.

*Second* is the State's economic rationale. The State wants to jump-start business activity and preserve the economic well-being of its citizens. The State has loosened restrictions on restaurants, bars, casinos, and gyms in part because many Nevada jobs and livelihoods, as well as other connected Nevada businesses, depend on those restaurants, bars, casinos, and gyms being open and busy. It is understandable for the State to balance public health concerns against individual economic hardship. Almost every State and municipality in America is struggling with that balance. After all, if preventing transmission of COVID–19 were the *sole* concern, a State would presumably order almost all of its businesses to stay closed indefinitely. But the economic devastation and the economic, physical, intellectual, and psychological harm to families and individuals that would ensue (and has already ensued, to some extent) requires States to make tradeoffs that can be unpleasant to openly discuss.

With respect to those tradeoffs, however, no precedent suggests that a State may discriminate against religion simply because a religious organization does not generate the economic benefits that a restaurant, bar, casino, or gym might provide. Nevada's rules reflect an implicit judgment that for-profit assemblies are important and religious gatherings are less so; that moneymaking is more important than faith during the pandemic. But that rationale "devalues religious reasons" for congregating "by judging them to be of lesser import than nonreligious reasons," in violation of the Constitution. *Lukumi*, 508 U. S., at 537–538. The Constitution does not tolerate discrimination against religion merely because religious services do not yield a profit.

More broadly, the State insists that it is in the midst of an emergency and that it should receive deference from the courts and not be bogged down in litigation. If the courts simply enforce the constitutional prohibition against religious discrimination, however, the floodgates will not open. I agree that courts should be very deferential to the States' line-drawing in opening businesses and allowing certain activities during the pandemic. For example, courts should be extremely deferential to the States when considering a substantive due process claim by a secular business that it is being treated worse than another business. Cf. *Jacobson* v. *Massachusetts*, 197 U. S. 11, 25–28 (1905). Under the Constitution, state and local governments, not the federal courts, have the primary responsibility for addressing COVID–19 matters such as quarantine requirements, testing plans, mask mandates, phased reopenings, school closures, sports rules, adjustment of voting and election procedures, state court and correctional institution practices, and the like.

But COVID–19 is not a blank check for a State to discriminate against religious people, religious organizations, and religious services. There are certain constitutional red lines that a State may not cross even in a crisis. Those red lines include racial discrimination, religious discrimination, and content-based suppression of speech. This Court's history is littered with unfortunate examples of overly broad judicial deference to the government when the government has invoked emergency powers and asserted crisis circumstances to override equal-treatment and free-speech principles. The court of history has rejected those jurisprudential mistakes and cautions us against an unduly deferential judicial approach, especially when questions of racial discrimination, religious discrimination, or free speech are at stake.

Finally, the State relies on the Court's recent temporary injunction decision in *South Bay United Pentecostal Church*

v. *Newsom*, 590 U. S. ___ (2020). There, the Court considered a California limitation on crowd size at religious services. California treated religious organizations better than some secular organizations, like movie theaters, but worse than other secular organizations, such as restaurants, supermarkets, retail stores, pharmacies, hair salons, offices, factories, and the like. In my view, the State of California's explanation, at least on that record, did not persuasively distinguish religious services from several of the favored secular organizations, particularly restaurants and supermarkets. But the Court ultimately denied the church's request for an emergency injunction. In his concurrence, THE CHIEF JUSTICE appropriately emphasized both the high standard for obtaining injunctive relief in this Court and the ongoing and rapidly changing public health emergency. THE CHIEF JUSTICE also noted that the favored secular activities did not involve people who "congregate in large groups" or "remain in close proximity for extended periods." *Id.,* at ___ (opinion concurring in denial of application for injunctive relief) (slip op., at 2).

I continue to think that the restaurants and supermarkets at issue in *South Bay* (and especially the restaurants) pose similar health risks to socially distanced religious services in terms of proximity to others and duration of visit. I suspect that many who have frequented all three kinds of establishments in recent weeks and months would agree. So I continue to respectfully disagree with *South Bay*.

But accepting *South Bay* as a precedent, this case is much different because it involves bars, casinos, and gyms. Nevada's COVID–19-based health distinction between (i) bars, casinos, and gyms on the one hand, and (ii) religious services on the other hand, defies common sense. As I see it, the State cannot plausibly maintain that those large secular businesses are categorically safer than religious services, or that only religious services—and not bars, casinos,

and gyms—entail people congregating in large groups or remaining in close proximity for extended periods of time. In any event, the State has not yet supplied a sufficient justification for its counterintuitive distinction.

\*　　　　\*　　　　\*

The Constitution "protects religious observers against unequal treatment." *Trinity Lutheran*, 582 U. S., at \_\_\_ (slip op., at 6) (internal quotation marks and alterations omitted). Nevada's 50-person attendance cap on religious worship services puts praying at churches, synagogues, temples, and mosques on worse footing than eating at restaurants, drinking at bars, gambling at casinos, or biking at gyms. In other words, Nevada is discriminating against religion. And because the State has not offered a sufficient justification for doing so, that discrimination violates the First Amendment. I would grant the Church's application for a temporary injunction. I respectfully dissent.