**FOR PUBLICATION**
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FILED

OCT 1 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| HARVEST ROCK CHURCH, INC., itself and on behalf of its member churches in California; HARVEST INTERNATIONAL MINISTRY, INC., itself and on behalf of its member churches in California,<br><br>        Plaintiffs-Appellants,<br><br>  v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California,<br><br>        Defendant-Appellee. | No.   20-55907<br><br>D.C. No.<br>2:20-cv-06414-JGB-KK<br>Central District of California,<br>Los Angeles<br><br>ORDER |

Before: O'SCANNLAIN, RAWLINSON, and CHRISTEN, Circuit Judges.

Dissent by Judge O'SCANNLAIN.

Harvest Rock Church, Inc., and Harvest International Ministry, Inc., (Harvest Rock) challenge the constitutionality of California Governor Gavin Newsom's COVID-19 Executive Orders and related restrictions (Orders) as they apply to in-person worship services. The district court denied Harvest Rock's request for a preliminary injunction barring enforcement of the Orders as to its in-person worship services. Harvest Rock appealed and has filed an emergency motion asking this court to enjoin enforcement of the Orders pending appeal.

In order to demonstrate that an injunction pending appeal is warranted, Harvest Rock must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016) ("The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction."). As to a likelihood of success on the merits, Harvest Rock must demonstrate that it is likely this court will conclude the district court abused its discretion in denying the preliminary injunction. *See, e.g.*, *Lopez v. Heckler*, 713 F.2d 1432, 1436 (9th Cir. 1983) (abuse of discretion standard governs an appeal from the denial of a preliminary injunction). Our review of the denial of a preliminary injunction is "limited and deferential." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). We consider "only the temporal rights of the parties until the district court renders judgment on the merits of the case based on a fully developed record." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) (citation omitted).

We find that Harvest Rock has not shown a likelihood of success on its argument that the district court abused its discretion by declining to enjoin the Orders. The evidence that was before the district court does not support Harvest Rock's arguments that the Orders accord comparable secular activity more favorable treatment than religious activity. The Orders apply the same restrictions to worship services as they do to other indoor congregate events, such as lectures and movie theaters. Some congregate activities are completely prohibited in every county, such as attending concerts and spectating sporting events. The dissent states that the restrictions applicable to places of worship 'do not apply broadly to all activities that might appear to be conducted in a manner similar to religious services,' but does not provide support for this point. By our read the restrictions on theaters and higher education are virtually identical.

Harvest Rock also contends that the Governor failed to provide a rationale for the more lenient treatment of certain secular activities, such as shopping in a large store. However, the Governor offered the declaration of an expert, Dr. James Watt, in support of the claim that the risk of COVID-19 is elevated in indoor congregate activities, including in-person worship services. Harvest Rock did not offer a competing expert or any other evidence to rebut Dr. Watt's opinion that congregate events like worship services are particularly risky. Because the district court based its order on the only evidence in the record as to the risk of spreading

3

COVID-19 in different settings, Harvest Rock is unlikely to show that the district court abused its discretion.

We also conclude that Harvest Rock failed to demonstrate that an injunction pending appeal is in the public interest. The Supreme Court considered and declined a similar request to enjoin application of California's Orders as to worship services in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring) (deference to state officials is "especially" warranted where "a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground."). Harvest Rock has not shown that the restrictions at issue in this appeal are materially different than those presented in *South Bay United Pentecostal,* and though we are not bound by it, we are persuaded by the Supreme Court's conclusion that injunctive relief is not warranted. *See United States v. Montero–Camargo*, 208 F.3d 1122, 1132 n. 17 (2000) (en banc) (non-binding Supreme Court dicta is accorded "appropriate deference" (citation omitted)).

For these reasons, the emergency motion for an injunction pending appeal (Docket Entry No. 6) is denied.

We grant the motion to file the amicus brief in support of the Governor for purposes of this emergency motion (Docket Entry No. 9).

4

*Harvest Rock Church, Inc. v. Newsom*, No. 20-55907

O'SCANNLAIN, J., dissenting:

At present, in 18 counties in California—home to more than 15 million residents and including its most populous county, Los Angeles—indoor religious worship services are completely prohibited.[1]  California insists that this drastic measure is necessary to fight the ongoing global COVID-19 pandemic—a worthy and indeed compelling goal of any State.  Yet, in these same counties, the State still allows people to go indoors to: spend a day shopping in the mall, have their hair styled, get a manicure or pedicure, attend college classes, produce a television show or movie, participate in professional sports, wash their clothes at a laundromat, and even work in a meatpacking plant.

The Constitution allows a State to impose certain calculated, neutral restrictions—even against churches and religious believers—necessary to combat emergent threats to public health.  But the Constitution, emphatically, does not allow a State to pursue such measures against religious practices more aggressively

---

[1] *See* Cal. Dep't Pub. Health, *Blueprint Data Chart* (Sept. 29, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20 Library/COVID-19/Blueprint_Data_Chart_092920.xlsx; State of California, *Covid-19 Blueprint Activity and Business Tiers* 1 (last updated Sept. 28, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/ COVID-19/Dimmer-Framework-September_2020.pdf.
    Attendance at in-person religious worship services is allowed but tightly capped in California's remaining counties, as explained below.  *See infra* Part II.A.

1

than it does against comparable secular activities. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2605 (2020) (mem.) (Alito, J., dissenting); *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1615 (2020) (mem.) (Kavanaugh, J., dissenting). Because California's present coronavirus-related initiatives do exactly that, I respectfully dissent from the majority's decision not to enjoin them pending Harvest Rock Church's appeal in this case.

## I

I first clarify a point that is somewhat obscured by the majority's decision: we are neither bound nor meaningfully guided by the Supreme Court's decision to deny a writ of injunction against California's restrictions on religious worship services earlier this year. *See South Bay United Pentecostal Church*, 140 S. Ct. at 1613. That decision, which considered a challenge to an earlier and much different iteration of California's restrictions, was unaccompanied by any opinion of the Court and thus is precedential only as to "the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (U.S. 1977) (per curiam). In that case, the Supreme Court considered whether to issue a writ of injunction under the All Writs Act, 28 U.S.C. § 1651(a), a more demanding standard than that which applies to the motion for an injunction pending appeal here. *Compare Hobby Lobby Stores, Inc. v. Sebelius*, 568 U.S. 1401, 1403 (2012) (Sotomayor, J., as Circuit Justice) (discussing the standard for issuing a writ of

2

injunction, which is an "extraordinary" measure to be "used sparingly" and "only when it is necessary or appropriate in aid of our jurisdiction and the legal rights at issue are indisputably clear" (alterations and internal quotation marks omitted)), *with Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006) ("In deciding whether to grant an injunction pending appeal, the court balances the plaintiff's likelihood of success against the relative hardship to the parties." (internal quotation marks omitted)). Without any opinion of the Court, we have no guidance whatsoever—not even in the form of "dicta" as the majority suggests, Maj. at 4—as to why the Court declined to provide such an extraordinary remedy, and we certainly have no basis to infer that a majority of the Court agreed upon some unstated rationale that somehow applies equally here.[2] *Cf. Makekau v. Hawaii*, 943 F.3d 1200, 1205 (9th Cir. 2019) ("[T]he mere fact that the injunction order issued under the All Writs Act does not prove that the Supreme Court . . . addressed the merits [of the underlying claim].").

## II

Turning to the motion before us, I respectfully disagree with the majority's conclusion that Harvest Rock Church is unlikely to succeed on the merits of its

---

[2] This is true even if one agrees—and to be clear, I do not agree—with the majority's assertion that Harvest Rock Church "has not shown that the restrictions at issue in this appeal are materially different than those presented in *South Bay United Pentecostal*." Maj. at 4.

free exercise challenge to California's severe restrictions on religious worship in the State.

There is no doubt that California's COVID-19 scheme (described more fully below) imposes direct and severe burdens on religious practice within the State. And where a State imposes such burdens through measures that are not "neutral and of general applicability," its actions must survive strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993). "The Free Exercise Clause bars even subtle departures from neutrality on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (internal quotation marks omitted). Because California's COVID-19 regulations patently disfavor religious practice when compared to analogous secular activities, I believe that the church is quite likely indeed to succeed on the merits of its challenge to such regulations.

A

First, California's complex morass of COVID-related restrictions fails even the "minimum requirement of neutrality": such restrictions discriminate against religious practice "on [their] face." *Lukumi*, 508 U.S. at 533.

Contrary to how California would portray its scheme, at this point there is no "neutral" or "generally applicable" State policy that one can apply to determine whether or to what extent any particular activity is permissible. Instead, California

4

has announced a variegated and ever-changing "Blueprint for a Safer Economy," which regulates all manner of in-person activities by meticulously delineating those activities which may take place. *See* State of California, *Blueprint for a Safer Economy* (last updated Oct. 1, 2020), https://covid19.ca.gov/safer-economy [hereinafter "*Cal. Blueprint*"]. Despite its deceptively cohesive title, this "Blueprint" is in reality an amalgamation of dozens of independent restrictions and "guidance" documents, each of which pertains only to a specific category of activity within the State. There are, at this point, independent restrictions targeted to nearly forty categories of activity (many of them further subdivided into more categories), including retail shopping outlets, grocery stores, offices, fitness centers, places of higher education, schools, barbershops, warehouses, food packing facilities, film and television studios, family entertainment centers, museums, professional sports facilities, and "places of worship." *See* State of California, *COVID-19 Industry Guidance* (last updated Sept. 29, 2020), https://covid19.ca.gov/industry-guidance [hereinafter "*Industry Guidance*"]. Under this patchwork scheme, it is the State's substantive categorization of an activity that determines its level of regulation, not any "neutral" or "generally applicable" feature of that activity itself.

Relevant here, the restrictions prescribed for "places of worship" limit attendance at in-person worship services as follows: (1) at the most severe, in

counties designated to be "Tier 1" risks for COVID-19 spread,[3] *no* in-person worship services may be held; (2) in Tier 2 counties, worship services may be held with no more than 25% of a building's capacity or 100 persons in attendance, whichever is fewer; (3) in Tier 3 counties, worship services can be held with no more than 50% of a building's capacity or 200 persons in attendance, whichever is fewer; and, finally, (4) in Tier 4 counties, worship services can be held with no more than 50% of a building's capacity, with no additional cap on attendance. State of California, *Covid-19 Blueprint Activity and Business Tiers* 1 (last updated Sept. 28, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/ CDPH%20Document%20Library/COVID-19/Dimmer-Framework- September_2020.pdf [hereinafter "*Blueprint Tiers*"].  Critically, these same parameters do not apply broadly to all activities that might appear to be conducted in a *manner* similar to religious services—for example, educational events, meetings, or seminars.  Instead, each of these (and many other potentially similar) activities is regulated entirely separately from, and often more leniently than, religious services.  *See Industry Guidance*, *supra* (providing restrictions separately governing institutes of higher education, museums, theaters, and schools); *see also,*

---

[3] The State assigns each county to one of four tiers based on the recently documented number of COVID-19 cases in the county.  The assignments are regularly reviewed and, as infection numbers change, a county may be moved up or down the State's tiers.  *See Cal. Blueprint*, *supra*.

6

*e.g.*, State of California, *COVID-19 Essential Workforce* (last updated Sept. 22, 2020), https://covid19.ca.gov/essential-workforce [hereinafter "*Essential Workforce*"] (designating as "essential workforce"—and therefore exempt from other COVID-19 restrictions—"academies and training facilities and courses for the purposes of graduating students and cadets that comprise the essential workforce for all identified critical sectors").  Indeed, even non-worship activities conducted by or within a place of worship are not subject to the attendance parameters outlined above.  *See* Cal. Dep't of Pub. Health, *COVID-19 Industry Guidance: Places of Worship and Providers of Religious Services and Cultural Ceremonies* 3 (July 29, 2020) [hereinafter "*Places of Worship Guidance*"].

In sum, the restrictions on religious worship services that Harvest Rock Church challenges here apply because—and *only* because—the activities they wish the host and partake in have been identified, substantively, as "religious" or "worship" services.

B

California contends that the many idiosyncratic lines it has drawn between activities within the State are not actually tied to the substantive content of those activities but instead reflect the State's expert judgment regarding the risk that each activity presents of spreading COVID-19.  The majority accepts the State's characterization, insisting that "the Governor offered the declaration of an

7

expert . . . in support of the claim that the risk of COVID-19 is elevated in indoor congregate activities, including in-person worship services." Maj. at 3. The problem, however, is that the very features that California's expert identified as especially dangerous in religious worship appear to have been ignored by the State in its decision to allow numerous other activities to occur, even though they self-evidently exhibit the same features.

California's epidemiological expert, Dr. James Watt, declared that the State determined church attendance to be particularly risky because: (1) gatherings of "people from different households" increase the risk of spreading the virus; (2) there have been "multiple reports" of COVID-19 spread resulting from religious events; (3) the virus is more likely to spread "when people are in close contact or proximity with one another (within about six feet)"; (4) the risk of transmission increases in groups where people speak, chant, shout, and sing in close proximity indoors; and (5) gatherings with "longer duration" increase the opportunity for the virus to spread. In his declaration, Dr. Watt distinguished the threat posed by religious services from the supposedly lesser threat posed by shopping in a store or working in an office where, according to him (but with no evidence or expertise in support),[4] interpersonal encounters are much briefer or more easily regulated.

---

[4] At oral argument on this motion, counsel for the State conceded that Dr. Watt is not qualified as an expert to opine on what takes place at religious worship services or how people interact there as opposed to in other settings of public life.

8

The first flaw in the majority's uncritical acceptance of this "evidence" supporting California's severe restrictions on church attendance is that the bulk of the identified risk factors have already been addressed by other measures imposed by the State. In those counties where indoor worship is actually allowed to take place, congregants must observe six-foot distancing, must wear masks, and may not sing or chant. *See generally Places of Worship Guidance*, *supra*. With such measures in place, Dr. Watt's professed concerns about physical proximity and vocal projections fall flat. How would the State distinguish a physically distanced, masked, and silent congregation sitting in a church from any other setting where the same number of people are present under the same roof for any other purpose? We do not know the answer, and I question whether the State could supply one that is neutral as to the practice of religion.

More centrally, even if we were to accept Dr. Watt's assertion that the State has reason to find religious services more dangerous than activities like shopping or working in an office, the glaring problem for the State is that it has offered no evidence to support the notion that the myriad *other* activities which are less restricted than religious services are somehow safer by these same parameters. The State more freely allows an abundance activities to take place which, on their

face, share the same risk factors that Dr. Watt identified as so concerning about church attendance, including: having one's hair cut and styled at a salon;[5] getting a manicure or pedicure;[6] working in a warehouse, food-production facility, or meatpacking plant;[7] playing, coaching, or broadcasting professional sports (including participating in games, practices, workouts, film sessions, and large team meetings);[8] attending college classes;[9] filming a television show or movie;[10]

---

[5] Barbershops and hair salons may open in all counties, without limitations on the number of people who may be present. *See Blueprint Tiers*, *supra*, at 1.

[6] As of September 22, 2020, nail salons may open in all counties, without limitations on the number of people who may be present. *See Blueprint Tiers*, *supra*, at 2.

[7] All of these facilities have been designated as "essential critical infrastructure," and they may operate in all counties, without limitations on the number of people who may be present. *See Blueprint Tiers*, *supra*, at 1; *Essential Workforce*, *supra*.

[8] In all counties, professional sports may take place without restrictions on the number of people present (but with no fans in attendance). *See Blueprint Tiers*, *supra*, at 5; *Industry Guidance*, *supra*.

[9] In all counties at least some courses, like laboratory sciences and studio arts, may be conducted indoors, without limitations on the number of people present. *See Industry Guidance*, *supra*.

[10] California has deemed "entertainment industries, studios, and other related establishments" to be "essential critical infrastructure," and such businesses may open in all counties, without restriction on the number of people in attendance. *See Blueprint Tiers*, *supra*, at 1; *Essential Workforce*, *supra*.

exercising at the gym;[11] or washing clothes at a laundromat.[12]  All of these

activities involve gatherings of people from different households for extended

periods of time—in many cases, hours on end.  Many are carried out in close

proximity with others including some—like playing sports, receiving a haircut,

getting a manicure, or acting out a scene in a movie—that simply cannot be

undertaken while also practicing six-foot social distancing and wearing a mask.

Some involve speaking loudly or shouting—for example, on an indoor television

studio set filled with actors projecting lines and directors barking orders or in an

indoor practice facility or locker room filled with dozens of professional athletes

and coaches shouting instructions to each other—which (unlike singing in a

church) the State has permitted to continue.  And some have been widely reported

to have resulted in significant outbreaks across the country, a fact the State itself

acknowledges.  *See* Cal. Dep't of Health, *COVID-19 Industry Guidance: Food*

*Packing and Processing* 1 (July 29, 2020) ("There have been multiple outbreaks in

a range of workplaces, [including at] hospitals, long-term care facilities, prisons,

---

[11] Although fitness centers must close in Tier 1 counties, at Tiers 2, 3, and 4 they may open at 10%, 25%, and finally 50% capacity respectively, with no additional cap on attendance like that imposed on churches.  *See Blueprint Tiers*, *supra*, at 3.  Thus, in a Tier 2 or 3 county, a fitness center with a capacity greater than 1,000 people would be allowed to admit more people than would a church of the same size.

[12] Laundromats are designated as "essential critical infrastructure" and may open in all counties, without limitations on the number of people who may be present *See Blueprint Tiers*, *supra*, at 1; *Essential Workforce*, *supra*.

food production, warehouses, meat processing plants, and grocery stores."); *see also, e.g.*, Anna Stewart, et al., *Why Meat Processing Plants Have Become COVID-19 Hotbeds*, CNN Health (June 27, 2020), https://www.cnn.com/2020/06/27/health/meat-processing-plants-coronavirus-intl/index.html; Brady Dennis & Chelsea Janes, *Coronavirus Outbreak in Major League Baseball Casts Pall Over Other Reopenings*, Washington Post (July 28, 2020), https://www.washingtonpost.com/health/2020/07/28/coronavirus-outbreaks-baseball-schools. Yet, despite sharing these supposedly critical features of church attendance, these activities are all more open and available to Californians. If the reason is based in some other neutral assessment of disease spread, it has not been provided to us in this case.

3

The majority makes much of the fact that, at this point, the State has imposed the same attendance restrictions on some secular "congregate" activities such as attending some academic lectures or going to see a movie in a theater. Maj. at 3. But the majority cannot dispute that not *all* such activities are so tightly restricted—such as participating in a college class in a laboratory or studio setting or attending a team meeting or film-review session in the auditorium of a professional sports facility. More to the point, even if it is true that the State has similarly regulated some congregate activities with analogous risks of disease

12

spread, that does not end our inquiry. Indeed, "it does not suffice to point out that *some* [comparable] secular businesses . . . are subject to the [same restrictions]," if the State cannot also explain why so many *other* comparable secular businesses have been treated more favorably. *Calvary Chapel Dayton Valley*, 140 S. Ct. at 2613–14 (Alito, J., dissenting); *see also id.* at 2614 ("The legal question is not whether religious worship services are all alone in a disfavored category, but why they are in the disfavored category to begin with." (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990))). Thus, the State cannot evade the Free Exercise Clause merely by linking its severe restrictions on worship attendance to those imposed on one or two categories of comparable secular activity; it must also justify its decision to treat more favorably a host of other comparable activities which so evidently raise the State's same expressed concerns about disease spread.

## C

Finally, we cannot overlook the fact that the State's restrictions on houses of worship explicitly exempt on-site *non-religious* activities from the strict attendance restraints. California's guidelines for places of worship warn of the supposed danger in individuals coming together specifically "to practice a personal faith," and they make clear that the restrictions on places of worship do not apply to non-worship activities including "food preparation and service, delivery of items to

those in need, childcare and daycare services, school and educational activities, in-home caregiving, counseling, office work, and other activities that places and organizations of worship may provide." *Places of Worship Guidance*, *supra*, at 3. Thus, California's framework would plainly permit a church in a Tier 1 county to host a group of people for some non-religious purpose, but the *same* church would be prohibited from hosting an event for the *same* people in the *same* setting for the *same* length of time simply if it were for purposes of religious worship. It is difficult to conceive of a more obvious form of discrimination against religious activity than that.

III

Because Harvest Rock Church is likely to succeed on the merits of its free-exercise challenge, it follows that the balance of hardships also tips in its favor. Without an injunction, the church and its congregants will be prohibited from exercising their First Amendment freedoms—the loss of which, "for even minimal periods of time, unquestionably constitutes irreparable injury." *In re Dan Farr Prods.*, 874 F.3d 590, 597 (9th Cir. 2017) (per curiam) (internal quotation marks omitted). And, while California has a compelling interest in limiting the spread of a deadly disease, the State is not harmed by pursuing that interest—as the Constitution requires—equally against religious and non-religious activities alike. *See, e.g.*, *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011)

14

("Maryland is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions.").

I respectfully dissent from the majority's decision to deny Harvest Rock Church's motion for an injunction pending appeal.