RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

PLEASANT VIEW BAPTIST CHURCH; PLEASANT VIEW
BAPTIST SCHOOL; PASTOR DALE MASSENGALE;
VERITAS CHRISTIAN ACADEMY; MARYVILLE BAPTIST
CHURCH; MICAH CHRISTIAN SCHOOL; PASTOR JACK
ROBERTS; MAYFIELD CREEK BAPTIST CHURCH;
MAYFIELD CREEK CHRISTIAN SCHOOL; PASTOR TERRY
NORRIS; FAITH BAPTIST CHURCH; FAITH BAPTIST
ACADEMY; PASTOR TOM OTTO; WESLEY DETERS and
MITCH DETERS, on behalf of themselves and their
minor children M.D., W.D., and S.D.; CENTRAL
BAPTIST CHURCH; CENTRAL BAPTIST ACADEMY;
PASTOR MARK EATON; CORNERSTONE CHRISTIAN
SCHOOL; CORNERSTONE CHRISTIAN CHURCH; JOHN
MILLER, on behalf of himself and his minor children
B.M., E.M., and H.M.,

> No. 21-6028

*Plaintiffs-Appellants*,

*v.*

ANDY BESHEAR, in his individual capacity,

*Defendant-Appellee*.

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:20-cv-00166—Gregory F. Van Tatenhove, District Judge.

Argued: December 8, 2022

Decided and Filed: August 14, 2023

Before: MOORE, STRANCH, and MURPHY, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills,
Kentucky, for Appellants. Taylor Payne, OFFICE OF THE GOVERNOR, Frankfort, Kentucky,

for Appellee.  **ON BRIEF:**  Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, Thomas B. Bruns, BRUNS CONNELL VOLLMAR & ARMSTRONG, Cincinnati, Ohio, for Appellants.  Taylor Payne, Travis Mayo, OFFICE OF THE GOVERNOR, Frankfort, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court in which STRANCH, J., joined in full. MURPHY, J. (pp. 20–25), delivered a separate concurring in the judgment.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  A group of churches, private religious schools, affiliated pastors, and the parents of students who sued on behalf of themselves and their minor children (collectively "Plaintiffs") sued Governor Andy Beshear of Kentucky in his individual capacity for alleged violations of their free-exercise rights, their rights to private-school education, and their rights to assemble peacefully and associate freely.  Plaintiffs allege that the Governor violated these rights when he issued Executive Order 2020-969 ("EO 2020-969"), a public-health measure that temporarily barred in-person learning at all private and public elementary and secondary schools in Kentucky in response to a surge in COVID-19 transmission in the winter of 2020.  After the parties litigated Plaintiffs' request for a preliminary injunction, Governor Beshear moved to dismiss the case and argued that qualified immunity shielded him from liability.  The district court granted the Governor's motion.  We **AFFIRM**.

## I. BACKGROUND

On November 18, 2020, Governor Beshear issued EO 2020-969, which temporarily required all elementary and secondary schools to transition to remote learning for a few weeks during the COVID-19 surge in the winter of 2020.  This was not the Governor's or Kentucky's first order aimed at curbing the spread of COVID-19.  In prior emergency decisions, this court determined that some of those prior orders likely violated individuals' free-exercise rights. Because Plaintiffs' pleadings and arguments heavily rely on those prior orders, as well as our review of those orders, we begin with a brief overview of them.

## A. The March 2020 Orders: *Maryville* and *Roberts*[1]

On March 19, 2020, Kentucky prohibited "[a]ll mass gatherings," defined as "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, *faith-based*, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities."[2]  R. 40-2 (Am. Compl. ¶¶ 8–9) (Page ID #416) (alteration in original) (emphasis added).  "[A] mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where persons may be in transit," or other spaces "where large numbers of people are present, but maintain appropriate social distancing."  *Id.* ¶¶ 11–12 (Page ID #416–17).

On March 25, 2020, the Governor issued Executive Order 2020-257, which "require[d] organizations that [were] not 'life-sustaining' to close."  *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 611 (6th Cir. 2020) (order) (per curiam).  The EO identified nineteen categories of life-sustaining organizations, which included organizations such as gas stations, banks, shipping and delivery services, funeral services, "[l]aundromats, accounting services, law firms, hardware stores, and many other entities [that] count as life-sustaining."  *Id.*; *see also Roberts v. Neace*, 958 F.3d 409, 411–12 (6th Cir. 2020) (order) (per curiam); Ky. Exec. Order No. 2020-257 ¶ 1 (Mar. 25, 2020).  These life-sustaining organizations could continue operating with the implementation of protective measures.  Ky. Exec. Order No. 2020-257 ¶ 3; *Maryville*, 957 F.3d at 614.  Religious organizations were considered life-sustaining organizations only "when they function as charities by providing 'food, shelter, and social services'"; otherwise, EO 2020-257 required that they cease in-person operations.  *Maryville*, 957 F.3d at 611; *see also* Ky.

---

[1]We rely on Plaintiffs' Amended Complaint as the basis for their factual allegations, including—where applicable—*factual* description of events before a court.  We do not, however, treat the Amended Complaint's description of courts' decisions, holdings, or reasoning as factual allegations.

[2]Plaintiffs alleged that Governor Beshear issued the March 19, 2020 order "acting through Secretary Eric Friedlander of the Cabinet for Health and Family Services."  R. 40-2 (Am. Compl. ¶ 8) (Page ID #416).  Acting under statutory authority as well as authority granted by Governor Beshear under Executive Orders No. 2020-215 and 2020-243, Kentucky's Cabinet for Health and Family Services issued the March 19, 2020 order.  March 19, 2020 Order, https://governor ky.gov/attachments/20200319_Order_Mass-Gatherings.pdf [https://perma.cc/WRM6-H2RH].  Commissioner of Public Health Steven J. Stack, M.D., and Acting Cabinet Secretary Eric Friedlander signed the order.  *Id.*

Exec. Order No. 2020-257 ¶¶ 1(d), 4.  Through these two orders ("March 2020 Orders"), which explicitly "prohibit[ed] 'faith-based' mass gatherings by name," *Maryville*, 957 F.3d at 614, Kentucky prohibited both in-person and drive-in church services, *see id.* at 611.

This court considered the legality of both orders on an emergency basis on May 2, 2020, when reviewing a district court's order denying an "emergency motion for a temporary restraining order" and an injunction to stop enforcement of the two orders pending appeal. *Maryville*, 957 F.3d at 611.  We determined that the Free Exercise Clause likely prohibited the ban on *drive-in* religious services and enjoined "enforc[ement of the] orders prohibiting drive-in services at" the plaintiffs' churches "during the pendency of th[e] appeal" as long as "the public health requirements mandated for 'life-sustaining' entities" were followed.  *Id.* at 616; *see also id.* at 614.  One week later, in *Roberts*, we addressed the March 2020 Orders' in-person prohibition on "'faith-based' 'mass gatherings.'"  958 F.3d at 411.  We concluded that the March 2020 Orders' "restriction on *in-person* worship services likely 'prohibits the free exercise' of 'religion,'" and enjoined enforcement of "orders prohibiting in-person services at" the plaintiffs' churches so long as they implemented the mandated public-health protective measures during the pendency of the appeal.  *Id.* at 413, 416 (emphasis added) (quoting U.S. Const. amends. I, XIV).

**B.  Executive Orders 2020-968 and 2020-969, Plaintiffs' Original Complaint, and the *Danville* Lawsuit**

We turn now to the executive orders at issue here.  On November 18, 2020, citing "a potentially catastrophic surge in COVID-19 cases which threaten[ed] to overwhelm our healthcare system and cause thousands of preventable deaths," Governor Beshear issued Executive Orders 2020-968 and 2020-969.  R. 40-2 (Am. Compl., Ex. A (EO 2020-968)) (Page ID #436); *id.* at Ex. B (EO 2020-969) (Page ID #439); *id.* ¶ 27 (Page ID #421).

***Executive Order 2020-968*[3]**:  EO 2020-968 imposed restrictions on restaurants and bars; social gatherings; fitness and recreation centers; venues, event spaces, and theaters; and professional services from November 20, 2020, until December 13, 2020.  R. 40-2 (Am. Compl., Ex. A ¶¶ 3–8) (Page ID #437–38).  EO 2020-968 either prohibited entirely or restricted indoor activities, imposed occupancy limits on these activities, and/or required the implementation of protective measures.  *Id.*  It *expressly* excluded houses of worship from these restrictions.  *Id.*, Ex. A ¶ 7 (Page ID #437–38).  It ordered offices to "mandate that all employees who are able to work from home do so, and close their businesses to the public when possible."  *Id.*, Ex. A ¶ 8 (Page ID #438).  Offices that remained open could not have "more than 33% of employees . . . physically present in the office any given day."  *Id.*  The order "d[id] not apply to education, childcare, or healthcare, which operate under separately issued guidance and orders."  *Id.*, Ex. A ¶ 2 (Page ID #437).

***Executive Order 2020-969***:  Plaintiffs challenge the constitutionality of EO 2020-969.  EO 2020-969 ordered "[a]ll public and private" "middle[] and high schools" to move from *in-person* learning to *remote* learning from November 23, 2020, until January 4, 2021.  R. 40-2 (Am. Compl., Ex. B ¶¶ 1–2) (Page ID #440).  "All public and private elementary . . . schools" also began remote learning on November 23, 2020, and could return to in-person learning if the schools fell outside the "red zone" and implemented various protective measures between December 7, 2020, and January 4, 2021.  *Id.*, Ex. B ¶¶ 1, 3 (Page ID #440).  By January 4, 2021, all schools would return to in-person learning.  *Id.* ¶ 3 (Page ID #440).  The EO permitted all schools to "provide[] small group in-person targeted services, as provided in [Kentucky Department of Education] guidance" and allowed "private schools conducted in a home solely for members of that household" to continue operating in person.  *Id.*, Ex. B ¶¶ 4–5 (Page ID

---

[3]Plaintiffs point to the secular activities regulated by EO 2020-968 in arguing that EO 2020-969 violated their constitutional rights but do not argue that EO 2020-968 independently deprived them of their constitutional rights.  *See generally* Appellants Br.; Reply Br.  Plaintiffs' issues-presented section specifically asks whether the "order" shutting down religious schools deprived them of their constitutional rights.  Appellants Br. at 1–2. Plaintiffs' headings in their reply brief confirm that EO 2020-968 is relevant for the free-exercise claim but does not support an independent claim.  *See* Reply Br. at 2 (referencing EO 2020-968 and EO 2020-969), *id.* at 18 (referencing only EO 2020-969), *id.* at 23 (referencing only EO 2020-969).  For clarity, our analysis below considers whether to compare the secular conduct restricted under EO 2020-968 as well as other conduct unaffected by the executive orders with the temporary closure of in-person religious schooling.

#440).  EO 2020-969 does not reference religion or religious activity in any way.  *See generally id.*

On November 23, 2020—the day schools were set to begin remote learning—Plaintiffs filed this lawsuit and moved for a temporary restraining order and preliminary injunction barring, among other things, enforcement of EO 2020-969 against private religious schools.  R. 1 (Original Compl.) (Page ID #1–44); R. 3 (Mot. for Prelim. Inj.) (Page ID #52–74).  The original complaint—which is no longer the operative complaint—was filed on behalf of additional plaintiffs and included additional claims and requests for relief.  *Compare* R. 1 (Original Compl.) (Page ID #1–44), *with* R. 40-2 (Am. Compl.) (Page ID #413–40).

Two days later, in a different lawsuit also addressing EO 2020-969, the U.S. District Court for the Eastern District of Kentucky preliminarily enjoined Governor Beshear "from enforcing the prohibition on in-person instruction with respect to any religious private school in Kentucky that adheres to applicable social distancing and hygiene guidelines."  *Danville Christian Acad., Inc. v. Beshear*, 503 F. Supp. 3d 516, 531 (E.D. Ky. 2020).  We stayed the preliminary injunction pending appeal on November 29, 2020, allowing EO 2020-969 to go into effect.  *Commonwealth v. Beshear* (*Danville*), 981 F.3d 505, 507 (6th Cir. 2020) (order) (per curiam).  We held that EO 2020-969, unlike the March 2020 Orders before it, likely did not violate the plaintiffs' free-exercise rights.  *Id.* at 509.  We explained that "Executive Order 2020-969 applies to all public and private elementary and secondary schools in the Commonwealth, religious or otherwise; it is therefore neutral and of general applicability and need not be justified by a compelling governmental interest."  *Id.*  The Supreme Court declined to vacate our stay on December 17, 2020, leaving EO 2020-969 in effect.  *Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527, 527–28 (2020).

## C.  Proceedings After Executive Order 2020-969 Expired on January 4, 2021

The same day that EO 2020-969 expired, R. 40-2 (Am. Compl., Ex. B) (Page ID #439–40), Governor Beshear moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6), R. 35-1 (Mem. in Support of Beshear Mot. to Dismiss) (Page ID #379–400).  The Governor argued that the action was moot, that certain plaintiffs lacked standing, that the EO did

not violate Plaintiffs' constitutional rights, and that the Governor was entitled to qualified immunity. *Id.* In response, Plaintiffs moved for leave to amend their original complaint to withdraw parties, claims, and requests for relief. R. 40 (Pls.' Mot. for Leave to Am.) (Page ID #408–11). Their proposed amended complaint would allege "three claims, which seek declaratory relief and damages." *Id.* at 2 (Page ID #409).

Plaintiffs' Amended Complaint alleged that Governor Beshear violated their free-exercise rights, rights to private education, and rights to freedom of association and peaceable assembly when he issued EO 2020-969. R. 40-2 (Am. Compl. ¶¶ 61–80) (Page ID #430–34). It alleged that the Governor "ban[ned] in-person religious education and instruction" while "permit[ting] a number of comparable secular activities of varying sizes." *Id.* ¶ 29 (Page ID #421). Plaintiffs compared and contrasted EO 2020-969's temporary in-person religious school closure with the following:

(1) activities subject to restrictions under EO 2020-968 (*e.g.*, permitting in-person gyms to operate at 33% capacity, *id.* ¶¶ 29, 33 (Page ID #421–22));

(2) activities subject to other regulations (*e.g.*, permitting in-person child-care programs to continue at limited occupancy, *id.* ¶ 30 & nn.3–4 (Page ID #421)); and

(3) activities that "remain[ed] open" (*e.g.*, "[g]as stations, grocery stores, [and] retail establishments," *id.* ¶¶ 35–37 (Page ID #422)).

Plaintiffs alleged that they hold sincere religious beliefs, which include "the importance of in-person instruction." *Id.* ¶¶ 42–49 (Page ID #423–27). They also alleged that they had implemented protective measures and that "there is absolutely no evidence of any community spread of COVID-19 within the school[s]." *Id.* They further alleged that their religious beliefs "would be substantially burdened, if the schools were prohibited from offering in-person, in-class instruction to their students." *Id.* ¶ 50 (Page ID #428).

The Governor opposed the motion for leave to amend, arguing that the proposed amendment was futile because the claims were moot and could not survive a motion to dismiss. R. 44 (Beshear's Opp'n to Pls.' Mot. for Leave to Am.) (Page ID #484–94). The district court granted Plaintiffs leave to amend and treated the Amended Complaint as operative. *Pleasant View Baptist Church v. Beshear*, No. 2:20-cv-00166-GFVT-CJS, 2021 WL 4496386, at *1–3

(E.D. Ky. Sept. 30, 2021).  Turning to the Governor's motion to dismiss, the district court found that Plaintiffs' requests for declaratory relief were moot.  *Id.* at *4–6.  It then determined that their three claims for monetary damages were not moot, but Governor Beshear was entitled to qualified immunity on those claims.  *Id.* at *6–9.  The district court therefore granted the Governor's motion to dismiss and dismissed the case.  *Id.* at *1, 9.  Plaintiffs filed a timely notice of appeal, seeking review of the dismissal of their three claims for monetary damages against Governor Beshear in his individual capacity on the basis of qualified immunity.  R. 62 (Notice of Appeal) (Page ID #669).

## II.  STANDARD OF REVIEW

"We review de novo the district court's grant of a motion to dismiss."  *Daunt v. Benson*, 999 F.3d 299, 307 (6th Cir. 2021) (quotation omitted).  "[W]e must determine whether the complaint 'fail[s] to state a claim upon which relief can be granted,' in which case dismissal is warranted."  *Id.* at 307–08 (second alteration in original) (quoting Fed. R. Civ. P. 12(b)(6)).  Our review "construe[s] the complaint in the light most favorable to the Plaintiffs," *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005)), and "[w]e accept all of the complaint's factual allegations as true but 'need not accept as true legal conclusions or unwarranted factual inferences,'" *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (citation omitted) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).  "[A] court may consider the complaint and any exhibits attached thereto in determining whether dismissal under Rule 12(b)(6) is proper."  *Cagayat v. United Collection Bureau, Inc.*, 952 F.3d 749, 755 (6th Cir. 2020).

## III.  QUALIFIED IMMUNITY

On appeal, we consider whether the district court erred when it dismissed Plaintiffs' three claims on the basis of qualified immunity.  "Whether qualified immunity applies to an official's actions is a question of law that this Court reviews *de novo*."  *Rhodes v. Michigan*, 10 F.4th 665, 672 (6th Cir. 2021) (quoting *Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001)).  "Where a defendant raises the defense of qualified immunity, 'it is the plaintiff's burden to show that the

defendants are not entitled to qualified immunity.'"  *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)).

Qualified-immunity analysis has two prongs.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the offic[ial]'s conduct violated a constitutional right?"  *Rhodes*, 10 F.4th at 672 (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).  Under the second prong, we evaluate whether "the right [was] clearly established" at the time of the challenged conduct.  *Id.* at 672, 679 (quoting *Silberstein*, 440 F.3d at 311).  For a right "[t]o be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* at 679 (second alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Though a plaintiff need not "point to a case 'on all fours with the instant fact pattern to form the basis of a clearly established right,'" there must be "a sufficiently analogous case (or cases) from which a 'reasonable official would understand that what he is doing violates that right.'"  *Id.* (first quoting *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019); and then quoting *Anderson*, 483 U.S. at 640).

**A.  Free-Exercise Claim**

The Supreme Court makes clear that qualified-immunity's two prongs can be considered in any order.  *Pearson*, 555 U.S. at 236.  Some jurists generally prefer to answer the constitutional question first, fearing that answering only the clearly established prong "risks constitutional stagnation" and can prevent a constitutional guarantee from becoming clearly established in the future.  *See* Paul W. Hughes, *Not A Failed Experiment:* Wilson-Saucier *Sequencing and the Articulation of Constitutional Rights*, 80 U. Colo. L. Rev. 401, 402 (2009) (explaining that a court's decision to answer the clearly established prong first "risks constitutional stagnation," *id.* at 402, and the "fail[ure] to articulate constitutional rights . . . deprive[s future litigants of] the benefit of knowing the content and scope of their rights," *id.* at 429); Aaron L. Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. Cal. L.

Rev. 1, 23–25, 35–38 (2015) (finding that "post-*Pearson* constitutional law continues to develop, but the finding of constitutional violations (when granting qualified immunity)—the pure *Saucier* development of constitutional law—has decreased," *id.* at 38, and finding "some stagnation with respect to rights-making," *id.* at 52); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (explaining before *Pearson* "that if the policy of [constitutional] avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals").

Some scholars have noted the value in courts articulating their "reasons for exercising (or not) their *Pearson* discretion to reach constitutional questions." Nielson & Walker, *supra*, at 52. Accordingly, we explain why we choose to exercise our *Pearson* discretion and consider the free-exercise claim under the clearly established prong. Just days after the Governor issued EO 2020-969, on November 29, 2020, this court considered this exact same free-exercise argument under the preexisting law and held that EO 2020-969 likely did not violate the Free Exercise Clause. *Danville*, 981 F.3d at 507–10.[4] In light of that ruling and other precedents, we find it doubtful, even implausible, that on November 18, 2020, the "constitutional question" of whether EO 2020-969 violated the Free Exercise Clause was "beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Because of *Danville*, we bypass the constitutional-violation prong and adjudicate Governor Beshear's qualified-immunity defense under the clearly established prong. *See Pearson*, 555 U.S. at 236.

We start by providing an overview of the law as it existed on November 18, 2020, because the "clearly established" inquiry mandates that even without "requir[ing] a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate," "at the time of the challenged conduct." *Al-Kidd*, 563 U.S. at 741. It is in that context, under the "pre-existing law," that "the unlawfulness must be apparent." *Anderson*, 483 U.S. at

---

[4]Plaintiffs argue that *Danville* is an "unreported panel decision" that we can and should ignore. Reply Br. at 5. Contrary to Plaintiffs' assertion, however, *Danville* is a published decision. *See generally Danville*, 981 F.3d 505–11.

640.  We must therefore confine our analysis to the law as it stood on November 18, 2020.[5]  *See id.*; *Al-Kidd*, 563 U.S. at 741; *Rhodes*, 10 F.4th at 679.

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"  *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)).  Thus, a law that is neutral, generally applicable, and "incidentally burdens religious practices usually will be upheld," whereas "a law that discriminates against religious practices usually will be invalidated [unless] it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'"  *Roberts*, 958 F.3d at 413 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 553 (1993)).  When reviewing neutral laws of generally applicability, we do not apply a heightened standard of review because doing so would:

> open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind—ranging from compulsory military service, to the payment of taxes; to health and safety regulation such as manslaughter and child neglect laws, compulsory vaccination laws, drug laws, and traffic laws; to social welfare legislation such as minimum wage laws, child labor laws, animal cruelty laws, environmental protection laws, and laws providing for equality of opportunity for the races.

*Smith*, 494 U.S. at 888–89 (citations omitted).

A law is not neutral if it discriminates on its face, if it is facially neutral but "targets religious conduct for distinctive treatment," or if its "object . . . is to infringe upon or restrict practices because of their religious motivation."  *Lukumi*, 508 U.S. at 533–34; *see also Roberts*, 958 F.3d at 413.  To determine neutrality, we consider, "among other things, the historical

---

[5]In *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), the Supreme Court issued further guidance on First Amendment free-exercise analysis.  As Plaintiffs acknowledge, "*Tandon* had not been decided at the time Defendant Beshear issued his orders at issue in this case, and so [Plaintiffs] do not rely on it under the clearly established prong." Reply Br. at 16.  For that reason, we decline to address Judge Murphy's discussion about *Tandon*.  Nothing should be inferred from our silence on this point.

background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540. A seemingly neutral "general ban[] that cover[s] religious activity," *Maryville*, 957 F.3d at 614, is not, however, generally applicable when the ban "in practice is riddled with," *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012), "exceptions for comparable secular activities," *Roberts*, 958 F.3d at 413. To determine whether a law is riddled with secular exceptions, we identify the similar secular activities to compare against the restricted religious activities—the appropriate secular analogue.

The parties disagree on what secular activities are similar to the temporary closure of in-person learning at religious schools. The Governor argues that because elementary and secondary schools are distinct in their environment and made up of students who cannot reliably comply with protective measures, they present unique COVID-19 risks, and therefore the secular activity with comparable COVID-19 risks to religious schools is secular schools. *See* Beshear Br. at 2, 10–11. That comparison echoes this court's analysis of EO 2020-969 in *Danville*. 981 F.3d at 509. Plaintiffs, on the other hand, argue for a broader analogue, urging the comparison between the treatment of religious schools against all other activities that were permitted to continue operating with or without restrictions. Appellants Br. at 16–19, 21–22. The problem for Plaintiffs, however, is that Governor Beshear issued EO 2020-969 amid an active and energetic constitutional debate regarding the selection of the appropriate secular analogue when adjudicating free-exercise claims.

Contrary to Plaintiffs' contention, our May 2, 2020 and May 9, 2020 orders in *Maryville* and *Roberts* did not make "sufficiently clear t[o] a reasonable official," *Anderson*, 483 U.S. at 640, that temporarily mandating remote learning for all elementary and secondary schools—religious and secular alike—ran afoul of the Free Exercise Clause. As an initial matter, lurking in the pages of our *Maryville* and *Roberts* orders is our concern that the two March 2020 Orders explicitly targeted religion. We described the March 2020 Orders as "hav[ing] several potential hallmarks of discrimination." *Maryville*, 957 F.3d at 614. For example, *Maryville* identified with apprehension the March 2020 Orders' facial reference to religious institutions, as they

expressly "prohibit[ed] 'faith-based' mass gatherings by name." *Id.*; *see also* Appellants Br. at 6–7 (describing the March 2020 Orders as facially targeting religious activities). We continued to communicate our concern about the March 2020 Orders' perceived hostility towards religious exercise in *Roberts*. *Roberts*, 958 F.3d at 414 (stating that the "congregants just want to be treated equally," "don't seek to insulate themselves from the Commonwealth's general public health guidelines," and should not be subject to the worst assumptions "when [they] go to worship but" the best assumptions "when [they] go to work or go about the rest of their daily lives in permitted social settings"). Both of our decisions also substantially detailed law enforcement's role in the potential criminal enforcement of the March 2020 Orders. *Maryville*, 957 F.3d at 611–12 (explaining that during "a drive-in Easter service" while the orders were in effect, "Kentucky State Police arrived in the parking lot[,] . . . issued notices to the congregants that their attendance at the drive-in service amounted to a criminal act," and "recorded congregants' license plate numbers and sent letters to vehicle owners requiring them to self-quarantine for 14 days or be subject to further sanction"); *id.* at 613 (stating later that "[o]rders prohibiting religious gatherings, enforced by police officers telling congregants they violated a criminal law and by officers taking down license plate numbers, amount to a significant burden on worship gatherings"); *Roberts*, 958 F.3d at 412, 415 (same). In *Danville*, we found *Maryville*'s and *Roberts*'s concerns about the March 2020 Orders' facial references to and perceived hostility towards religion noteworthy and distinguishable from EO 2020-969, which "cannot be plausibly read to contain even a hint of hostility towards religion." *Danville*, 981 F.3d at 509 ("In *Roberts*[] and *Maryville*, the challenged COVID-19 orders . . . appl[ied] *specifically* to houses of worship." (citations omitted) (emphasis added)).

It is of course true that when considering whether restrictions on in-person and drive-in religious mass-gatherings would likely violate the Constitution, *Maryville* and *Roberts* treated—as comparable secular activities to church services—locations like "law firms, laundromats, liquor stores, gun shops, airlines, mining operations, funeral homes, and landscaping businesses" that could operate while implementing protective measures. *Roberts*, 958 F.3d at 414; *see also* *Maryville*, 957 F.3d at 614. But neither *Maryville* nor *Roberts* stated a standard or discussed an approach for how to identify an appropriate secular analogue. We merely observed—without any legal citations—that "*many* of the [March 2020 Orders'] serial exemptions for secular

activities pose comparable public health risks to worship services." *Maryville*, 957 F.3d at 614 (emphasis added); *Roberts*, 958 F.3d at 414 (same). Contrary to Plaintiffs' contention, Appellants Br. at 16–17, however, we did not hold or make any controlling statement of law that any secular activity that posed the same COVID-19 risks was per se similar for the purpose of our analysis. *Maryville*, 957 F.3d at 614; *Roberts*, 958 F.3d at 414. Rather, we relied on *Ward*, 667 F.3d at 738, in support of the proposition that "the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Maryville*, 957 F.3d at 614; *Roberts*, 958 F.3d at 413. We also told the Governor that he could consider the ability to enforce social-distancing and mitigation efforts when responding to the COVID-19 pandemic. *See Roberts*, 958 F.3d at 414 ("Some groups in some settings, we appreciate, may fail to comply with social-distancing rules. If so, the Governor is free to enforce the social-distancing rules against them for that reason and in that setting, whether a worship setting or not."). In short, after *Maryville* and *Roberts*, uncertainty and debate remained active regarding how to identify the appropriate secular analogue, thus failing to clearly establish that it might constitute a constitutional violation to close all schools including temporarily close in-person religious schools, while leaving open with restrictions locations like restaurants, theaters, gas stations, grocery stores, retail establishments, and gyms.

This is reenforced by Justice Alito's own observation, made a few months after the issuance of EO 2020-969, that "identifying the secular activities that should be used for comparison has been *hotly contested*" by the courts, particularly in the context of COVID-19. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1921–22 (2021) (Alito, J., concurring) (emphasis added) (collecting cases and detailing their conflicting approaches when identifying comparators). In making this point, Justice Alito offered numerous examples. *Id.* at 1922. His first example of the "hotly contested" debate occurred on May 29, 2020, just a few days after *Maryville* and *Roberts*, when the Supreme Court decided *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020). In *South Bay*, the Court refused to enjoin a California order that imposed "temporary numerical restrictions on public gatherings," including a limit of "25% of building capacity or a maximum of 100 attendees" at houses of worship. 140 S. Ct. at 1613 (Roberts, C.J., concurring). The Chief Justice's concurring opinion identified the comparable secular activities as "lectures, concerts, movie showings, spectator sports, and theatrical

performances, where large groups of people gather in close proximity for extended periods of time." *Id.* The California order exempted "only *dissimilar* activities, such as operating grocery stores, banks, and laundromats"—activities that the Chief Justice described as those "in which people neither congregate in large groups nor remain in close proximity for extended periods." *Id.* (emphasis added). The Chief Justice's analysis distinguished between large group environments in which people remained in close proximity for a prolonged period of time from other public environments where, despite the large quantity of people, they neither congregate together nor remain in close proximity for a prolonged period of time. *Id.* The dissenting justices disagreed, however, and found those same activities comparable to houses of worship for the purposes of the free-exercise analysis. *S. Bay*, 140 S. Ct. at 1615 (Kavanaugh J., dissenting). The justices' disagreement and treatment of religious gatherings as "dissimilar" from grocery stores, banks, and laundromats, undermines any suggestion that *Maryville* and *Roberts* (issued **before** *South Bay*), clearly established how to determine which secular conduct to compare. *South Bay* reflects a continued disagreement regarding how to *apply* our legal principles and *conduct* that comparison.

Another one of Justice Alito's examples of the "hotly contested" debate was *Danville* itself. *Fulton*, 141 S. Ct. at 1922 (Alito, J., concurring). Though our decision in *Danville* is not part of the retrospective legal landscape that we consider in our clearly established analysis (because it was decided eleven days *after* Governor Beshear issued the EO[6]), this court's analysis of the exact conduct at issue here and the precedent that controlled when Governor Beshear issued EO 2020-969 both demonstrate the live debate on this exact constitutional question on November 18, 2020. *Danville*'s ruling shows that three judges of this court engaged in scholarly review of the "pre-existing law," *Anderson*, 483 U.S. at 640, and concluded that EO 2020-969 was constitutional under the Free Exercise Clause. This further provides strong

---

[6]Plaintiffs argue that *Danville* should be ignored for the purposes of assessing whether the right was clearly established because of its purported "deviation" from the other panels' decisions. Appellants Br. at 32. This argument fails. In addition to the fact that *Danville* does not conflict with prior precedent, neither Plaintiffs' cited authority, *King v. Taylor*, 694 F.3d 650, 660, n.7 (6th Cir. 2012), nor this court's precedent supports excluding certain cases from the clearly established legal landscape. Plaintiffs point to a pre-merits portion of *King* that addresses whether a party forfeited its service-of-process defense, 694 F.3d at 655, 658–60, where we explained that if "more recent cases might suggest" a different forfeiture rule, the prior case controlled, *id.* at 660 n.7. Only later did we turn to the merits and consider qualified immunity. *Id.* at 661–65.

evidence that unlawfulness was not apparent and that an active and vibrant debate on the constitutional question existed at the time of the challenged conduct. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy."). Even outside the qualified-immunity context, we have recognized the impact that "judicial disagreement" and the circuit's "unsettled jurisprudence" have on government officials. *See United States v. Reed*, 993 F.3d 441, 444 (6th Cir. 2021) (quoting *United States v. Hodge*, 246 F.3d 301, 309 (3d Cir. 2001) (Alito, J.)) (explaining judicial disagreement and the circuit's "'unsettled jurisprudence'" permitted an official to reasonably rely on what might otherwise be an unconstitutional warrant as the court could not expect officials "to know better than judges," *id.* at 452 (first quoting *Hodge*, 246 F.3d at 309)).

Neither this court's nor the Supreme Court's precedent clearly established that temporarily closing in-person learning at all elementary and secondary schools would violate the Free Exercise Clause when Governor Beshear issued EO 2020-969 on November 18, 2020. As the Governor points out, Plaintiffs have not provided this court with any cases denying a government official qualified immunity for their immediate public-health response to the COVID-19 pandemic. Beshear Br. at 6. Because the Governor issued EO 2020-969 in the midst of a vibrant debate on this constitutional issue, he is thus entitled to a qualified-immunity defense. Accordingly, because Plaintiffs cannot demonstrate that a clearly established right existed at the time Governor Beshear issued EO 2020-969, we **AFFIRM** the district court's dismissal of Plaintiffs' free-exercise claim.

## B. Private-Education Claim

Plaintiffs' claim that Governor Beshear violated their rights to private education under the Fourteenth Amendment also fails. In a short section of their brief, Plaintiffs argue that parents were denied their rights to send their children to in-person private religious school. Appellants Br. at 37. The constitutional right to a private education concerns a parent's choice regarding whether to send their children to private school and direct their curriculum. *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (addressing parental rights to direct and control education of children); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) (addressing parental rights against

children's compelled attendance at public school); *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (addressing parents' right against children's compelled schooling above a certain age).  EO 2020-969 deprived the parent plaintiffs of neither a choice to send their children to private school over public school nor input in their children's curriculum.  Plaintiffs do not allege that any children were precluded from enrolling in private schools while the EO was in effect or that the government intervened in the schools' curriculum.  *See* R. 40-2 (Am. Compl. ¶¶ 74–75).  Under these circumstances, EO 2020-969 did not implicate Plaintiffs' rights to private education.  The non-parent plaintiffs point to no authority establishing that this right exists outside the parental context.  Nonetheless, even if Plaintiffs could establish a constitutional violation, their claim would still fail because they have not demonstrated that the right was clearly established.  Because Governor Beshear is also entitled to qualified immunity on this claim, we **AFFIRM** the district court's dismissal of Plaintiffs' claim that the Governor violated their rights to private education.

## C.  Peaceful-Assembly and Freedom-of-Association Claims

Plaintiffs' final claim is that EO 2020-969 violated their rights to assemble peacefully and associate freely.  But, because Plaintiffs' brief addresses this final claim "in a perfunctory manner, unaccompanied by some effort at developed argumentation," they have forfeited their claim.  *United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).  Their one-page section on this claim simply names the Constitution's two forms of association (intimate and expressive), incorrectly states that strict-scrutiny analysis applies to their intimate-association claim, and then ends with the conclusory statement that a prohibition on gatherings violated their expressive-association rights.  Appellants Br. at 39.  The failure to develop any actual arguments on these points, including articulation of which rights are implicated and how the EO interfered with or burdened those rights, renders the argument forfeited.

Even so, Plaintiffs' claims would fail on the merits.  "The Constitution protects two distinct types of association: (1) freedom of *expressive* association, protected by the First Amendment, and (2) freedom of *intimate* association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment."

*Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004) (emphases added).  Under the right to intimate association, "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State."  *Id.* (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984)).  The right protects interpersonal relationships, including "those that attend the creation and sustenance of a family—marriage; childbirth; the raising and education of children; and cohabitation with one's relatives."  *Jaycees*, 468 U.S. at 619 (citations omitted); *Johnson v. City of Cincinnati*, 310 F.3d 484, 499 (6th Cir. 2002).  "The kinds of personal associations entitled to constitutional protection are characterized by 'relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.'"  *Anderson*, 371 F.3d at 881 (quoting *Jaycees*, 468 U.S. at 620).  After identifying an "intimate association," we next determine whether the challenged law "direct[ly] and substantial[ly] interfere[s]" with the intimate association.  *Id.* at 882.  If there is "[a] 'direct and substantial interference' with intimate associations" the law "is subject to strict scrutiny, while lesser interferences are subject to rational basis review."  *Id.* (quoting *Akers v. McGinnis*, 352 F.3d 1030, 1040 (6th Cir. 2003)).

Plaintiffs point to one intimate association—a "family member's right to participate in child rearing and education."  *Johnson*, 310 F.3d at 499; Appellants Br. at 39.  But, "we will find 'direct and substantial' burdens on intimate associations 'only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations].'"  *Anderson*, 371 F.3d at 882 (alterations in original) (quoting *Akers*, 352 F.3d at 1040).  Plaintiffs fail to allege or argue how all plaintiffs can raise this intimate-association claim, rather than just the parents.  Even the parent plaintiffs fail to address how the temporary transition to remote learning "absolutely or largely prevented" parents from forming these intimate associations.  *Id.*  Moreover, temporary remote learning did not affect the parents' choices of which schools to enroll their children in or the content of the curriculum.  Accordingly, Plaintiffs have not demonstrated a direct and substantial interference with a right of intimate association.  EO 2020-969 is rationally related to the legitimate government interest of curbing the spread of COVID-19.  Plaintiffs' intimate-association argument fails.

The right to expressive association provides "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Anderson*, 371 F.3d at 881 (quoting *Jaycees*, 468 U.S. at 618). Plaintiffs also briefly state that EO 2020-969 violated their association rights by denying them expressive association. The Supreme Court has recognized that the right "protects more than just a group's membership decisions," and it has held unconstitutional "laws . . . requir[ing] disclosure of membership lists for groups seeking anonymity," laws that "impose penalties or withhold benefits based on membership in a disfavored group," and "[t]he forced inclusion of an unwanted person in a group." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006) (citations omitted); *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)). Plaintiffs neither asserted one of these protected forms of expressive association nor identified how EO 2020-969's temporary-remote-schooling requirement interfered with their expressive-association rights beyond using the phrase "a prohibition to gather." We cannot guess for them. Accordingly, this argument fails as well.

The Governor did not violate Plaintiffs' rights to assemble peacefully or associate freely. Here too, even if the Governor had violated these rights, Plaintiffs have failed to carry their burden to demonstrate that the rights were clearly established. Accordingly, we **AFFIRM** the district court's dismissal of Plaintiffs' peaceful-assembly and freedom-of-association claims.

## IV. CONCLUSION

For the foregoing reasons, we hold that Governor Beshear is entitled to qualified immunity on the Plaintiffs' free-exercise claim because the temporary closure of in-person learning at all elementary and secondary schools, including private religious schools, during a surge in COVID-19 transmission did not violate clearly established rights. We further hold that the Governor did not violate Plaintiffs' rights to private education or rights to assemble peacefully and associate freely. We therefore **AFFIRM** the judgment of the district court.

———————————

**CONCURRENCE**

———————————

MURPHY, Circuit Judge, concurring in the judgment. In November 2020, Kentucky Governor Andy Beshear temporarily barred in-person instruction at all schools (including religious schools) to slow the spread of COVID-19. A group of religious schools and a few parents (whom I will call the "Schools") sued him over this closure. The Schools now seek damages from the Governor. They allege that his ban on in-person instruction violated their right to the "free exercise" of religion. U.S. Const. amend. I. To overcome the Governor's qualified-immunity defense, however, the Schools must do more than show that he violated the Free Exercise Clause. They must also show that he violated "clearly established" free-exercise law. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). I agree with my colleagues that the Schools cannot make the second showing. But I reach that result through different reasoning.

\*

In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Court held that a "neutral" and "generally applicable" law does not violate the Free Exercise Clause even if the law restricts conduct undertaken for religious reasons. *Id.* at 878–80. Since *Smith*, the Court has subjected to strict scrutiny only those regulations that flunk its "neutral" and "generally applicable" test. *See, e.g.*, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993). This case thus requires us to ask whether the Governor's school closure qualified as a neutral and generally applicable ban under *Smith*. I see two ways to look at that question: from our perspective today and from his perspective in 2020. This timing makes a critical difference.

Today, we have the benefit of *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam). That decision offers clear guidance on how to decide whether a regulation is neutral and generally applicable. A ban on in-person instruction at religious schools cannot satisfy this test if

the government has regulated "*any* comparable secular activity" with a lighter touch. 141 S. Ct at 1296. In other words, a regulation that burdens religiously motivated conduct will "trigger strict scrutiny" even if contains just *one* comparable secular exception to its restrictions. *See id.* In effect if not in name, *Tandon* adopted a "most-favored nation status" for religious exercise: the government must treat religious conduct as favorably as the least-burdened comparable secular conduct. *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2611 (2020) (Kavanaugh, J., dissenting from denial of application for injunctive relief) (citation omitted).

*Tandon* next gives clear guidance on how to decide whether secular conduct is "comparable" to religious conduct. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* That is, we must identify the *reason* why the government has burdened religion. We then must ask whether that reason extends to the unburdened secular conduct. *See id.* If so, the law is not generally applicable. *See id.* That is true even if the religious conduct (say, going to a prayer group) and the secular conduct (say, going to a bar) are quite different. *See id.* at 1297. In this respect, *Tandon* adopted our reasoning in *Monclova Christian Academy v. Toledo-Lucas County Health Department*, 984 F.3d 477 (6th Cir. 2020) (order). There, we recognized that the test for comparing more-restricted religious conduct and less-restricted secular conduct turns on "the *interests* the State offers" for its restriction. *Id.* at 480. The test does not turn on "whether the religious and secular conduct involve similar forms of activity." *Id.*

*Tandon* lastly explained how this comparability test operates in the COVID-19 context. Because COVID-19 regulations exist to fight the disease's spread, "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather." *Tandon*, 141 S. Ct. at 1296. If a regulation limits religious conduct more strictly than secular conduct that poses a similar risk of COVID-19 spread, it is not generally applicable. *See id.* For example, if a government decides that it must sharply limit the attendance at churches to stop the spread of COVID-19, it must extend these sharp limits to all similarly risky secular gatherings. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66–67 (2020) (per curiam).

According to the Schools, their complaint alleges that the Governor's orders flunk this test. He did not prohibit all in-person attendance at many secular venues, from childcare centers to gyms to retail stores. Yet the complaint says that these venues posed "the same or even greater potential risk" of COVID-19 than the Schools. Am. Compl., R.40-2, PageID 431. The Schools had seen "no evidence of any community spread of COVID-19" at their locations. *Id.*, PageID 424–28. The Director of the Centers for Disease Control and Prevention also opined that the "existing data" at the time showed that "K-12 schools [were] not transmission pathways for the virus, in part due to safety protocols in place[.]" *Id.*, PageID 415 n.2 (summarizing press briefing). Because we must accept these allegations at this stage, the Schools argue, the Governor's orders triggered strict scrutiny by regulating comparable secular activities less strictly than the Schools.

\*

Yet we need not decide whether the Schools allege a free-exercise violation under current law. To defeat the Governor's qualified-immunity defense, they must prove that *Tandon*'s legal framework was "clearly established *at the time*" that the Governor acted. *Wesby*, 138 S. Ct. at 589 (citation omitted) (emphasis added). This requirement disqualifies most of the decisions that clarify existing law. The Governor issued the challenged order on November 18, 2020. So we may not look to the principles announced in *Tandon*. The Supreme Court issued that decision in April 2021. Nor may we look to the principles in the case on which *Tandon* relied: *Roman Catholic Diocese of Brooklyn*. The Court issued that decision a week after the Governor's order. And we may not fall back on the similar principles we announced in *Monclova*. We issued that opinion over a month after the Governor's order. 984 F.3d at 479.

Unlike my colleagues, I read several earlier decisions to clearly establish one part of *Tandon*'s framework: that a secular activity is "comparable" to religious conduct if it poses a similar risk of COVID-19 spread. As far back as *Lukumi*, the Court held that this general-applicability test turns on whether unbanned secular conduct "endangers" the interests advanced by the law "in a similar or greater degree" than the burdened religious conduct. 508 U.S. at 543. And because COVID-19 regulations advanced the government's interest in public health, we asked in this context whether the regulations exempted secular activities that "pose[d]

comparable public health risks" to banned worship services. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) (per curiam); *Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (per curiam).

Critically, though, no decision clearly established the "most-favored nation" part of *Tandon*'s legal rule: that regulations do not qualify as "neutral and generally applicable" if "they treat *any* comparable secular activity more favorably than religious exercise." 141 S. Ct. at 1296. Thus, no earlier decision clearly barred the Governor's logic that a school regulation qualified as neutral and generally applicable as long as it covered religious and non-religious schools alike.

Start with the Supreme Court's precedent. In *Smith*, which first adopted the "neutral and generally applicable" test, the Court considered a ban on controlled substances that "obviously" satisfied this test. Douglas Laycock & Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 5 (2016); *see Smith*, 494 U.S. at 874. In the decades after *Smith*, the Court offered further guidance on this test only once, in *Lukumi*. *See* Laycock & Collis, *supra*, at 5–6. But *Lukumi* provided little help on this topic because it involved an equally obvious religious "gerrymander." 508 U.S. at 536. The effect of the relevant ordinances left no doubt that city officials had written them to ban only the practices of a specific religion. *See id.* at 531–46. *Lukumi* thus did not need to "define with precision the standard used to evaluate whether a prohibition is of general application" because the ordinances would fail any standard. *Id.* at 543.

Until recently, then, the Court had not explained in detail how we should apply its general-applicability test when a government edict falls in between a regulation that was obviously general (as in *Smith*) and one that was obviously not (as in *Lukumi*). This lack of precedent had produced "confusion and disagreement" in this area by the time of the Governor's orders. *Calvary Chapel*, 140 S. Ct. at 2610 (Kavanaugh, J., dissenting from denial of application for injunctive relief); *see* Christopher C. Lund, *A Matter of Constitutional Luck: The General Applicability Requirement in Free Exercise Jurisprudence*, 26 Harv. J.L. & Pub. Pol'y 627, 639–41 (2003) (summarizing debate). Justices and scholars alike described the Court's standards as "perplexing." *Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527, 529 (2020) (Gorsuch, J.,

dissenting from denial of application to vacate stay) (citing Laycock & Collis, *supra*, at 5–6). But a perplexing test is not a clearly established one. *See Wesby*, 138 S. Ct. at 590.

Unable to rely on Supreme Court cases, the Schools fall back on our own. In the months before the Governor's actions, we had twice granted injunctive relief to religious entities in this COVID-19 context, allowing those entities to hold drive-in and in-person worship services. *See Maryville*, 957 F.3d at 616; *Roberts*, 958 F.3d at 416. Yet we did not then articulate *Tandon*'s rigorous rule applying strict scrutiny whenever the government treats even one "comparable secular activity more favorably than religious exercise." 141 S. Ct. at 1296. Rather, we articulated a more flexible "rule of thumb" that "the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Maryville*, 957 F.3d at 614 (citing *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012)). In other words, we held that at "some point" a policy will contain so many secular exceptions that it will lose its generally applicable status and resemble "a system of individualized exemptions[.]" *Ward*, 667 F.3d at 740.

Unlike *Tandon*, these cases suggested a general standard rather than a specific rule. Like the Fourth Amendment's generic reasonableness test, that standard gave government actors more room to be wrong in their decisionmaking without losing their qualified-immunity protections. *See Wesby*, 138 S. Ct. at 590; *cf. Harrington v. Richter*, 562 U.S. 86, 101 (2011). And the Governor could reasonably have thought that, despite some exceptions for comparable secular activities, his decision to close all schools—including secular schools—rendered his order generally applicable. He should not face monetary liability simply because he did not predict *Tandon*'s stricter test.

Indeed, we ourselves failed to predict *Tandon*'s stricter test. We stayed an injunction of the Governor's school-closure order shortly after he issued it without asking whether he had imposed lesser burdens on "*any* comparable secular activity" (that is, any secular activity that posed a similar risk of COVID-19 spread). *Tandon*, 141 S. Ct at 1296; *see Kentucky ex rel. Danville Christian Acad., Inc. v. Beshear*, 981 F.3d 505, 509 (6th Cir. 2020) (order). The Governor's successful motion to stay the injunction of his school-closure order makes it difficult to say that he acted in a "plainly incompetent" manner. *Wesby*, 138 S. Ct. at 589 (citation

omitted); *see Elim Romanian Pentecostal Church v. Pritzker*, 22 F.4th 701, 703 (7th Cir. 2022) (per curiam).  That fact forecloses the Schools' damages claim.  *See Wesby*, 138 S. Ct. at 589–90.

\* \* \*

All of this leaves the Schools' remaining claims.  They also allege that the Governor violated the Fourteenth Amendment right of parents to give their children the education of their choice and the First Amendment right of association.  I agree with my colleagues that the Schools' three pages of analysis on these claims do not overcome the Governor's qualified immunity.  Given the limited briefing, though, I would not opine on the merits.  I would again hold only that the Governor did not violate clearly established law.  *See id.*

For all of these reasons, I concur in the judgment.